| | |
|---|---|
| 1 | Jade H. Chen, Esq. (State Bar No. 330810) |
| 2 | jade@tcwlaws.com |
|   | **TCW GLOBAL LEGAL GROUP** |
| 3 | 490 South Fair Oaks Ave |
| 4 | Pasadena, CA 91105 |
|   | Tel.: 626-796-9977 |
| 5 | |
| 6 | William B. DeClercq (State Bar No. 240538) |
|   | william@declercqlaw.com |
| 7 | **DECLERCQ LAW, P.C.** |
| 8 | *Mailing Address:* |
|   | 440 N. Barranca Ave., #1177 |
| 9 | Covina, CA 91723 |
| 10 | *By appointment:* |
| 11 | 445 S. Figueroa St., Suite 3100 |
|    | Los Angeles, CA 90071 |
| 12 | Tel.: (626) 408-2150 |
| 13 | |
| 14 | Attorneys for Plaintiff High Sharp Electronic Limited |
|    | a Texas corporation |

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **HIGH SHARP ELECTRONIC LIMITED**, a Texas corporation;<br><br>Plaintiff,<br><br>vs.<br><br>**SEMICONDUCTOR MANUFACTURING SOUTH CHINA CORPORATION;** a People's Republic of China Shanghai corporation and a subsidiary of **SEMICONDUCTOR MANUFACTURING INTERNATIONAL CO (SMIC),** a | Case No.:  2:23-cv-8934<br><br>**COMPLAINT FOR:**<br>1) **FRAUD;**<br>2) **CONVERSION;**<br>3) **BREACH OF CONTRACT;**<br>4) **BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING;**<br>5) **INTENTIONAL INTERFERENCE WITH PROSPECTIVE** |

COMPLAINT

| | |
|---|---|
| 1  Cayman Islands corporation; **XING WANG,** an individual; **LIANG MONG SONG**, an individual; **ZHAO HAIJUN**, an individual; and DOES 1 through 100, inclusive,<br><br>Defendants. | ECONOMIC ADVANTAGE;<br>6) NEGLIGENT INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE;<br>7) *QUANTUM MERUIT* – UNJUST ENRICHMENT; and<br>8) UNFAIR COMPETITION IN VIOLATION OF BUS. & PROF. CODE 17200<br><br>[JURY TRIAL DEMANDED] |

**COMPLAINT**

Plaintiff HIGH SHARP ELECTRONIC LIMITED, a Texas corporation ("Plaintiff" or "High Sharp"), by and through undersigned counsel, hereby complains against defendants SEMICONDUCTOR MANUFACTURING SOUTH CHINA CORPORATION; a People's Republic of China Shanghai corporation and a subsidiary of SEMICONDUCTOR MANUFACTURING INTERNATIONAL CO (SMIC), a Cayman Islands corporation; XING WANG, an individual; LIANG MONG SONG, an individual; ZHAO HAIJUN, an individual; and DOES 1 through 100, inclusive, (collectively, "Defendants"), and alleges, as follows:

## SUMMARY OF THE CASE

1. Plaintiff pre-paid Defendants millions of dollars – paid in full and in advance – to obtain specialized and highly valuable computer chips called "wafers" on a time-sensitive basis. Defendants knew the wafers were intended to be used in the manufacture of specialized computers called cryptocurrency "miners" which Plaintiff anticipated to have great value at the time of the order due to demand driven by keen and growing public interest in cryptocurrencies like Bitcoin in 2021.

2. Defendants never intended to deliver any wafers to Plaintiff. Instead, Defendants used Plaintiffs' pre-payment to fund the manufacture and delivery of wafers to third parties after conducting a secret bidding war to fetch the highest price possible, and never delivered anything to Plaintiff, thereby intentionally and fraudulently doubly damaging Plaintiff.

3. Because Plaintiff expended virtually all its resources pre-paying Defendants for wafers that Defendants had no intention to deliver and indeed sold off to the highest bidder during a bull market, Plaintiff entirely missed its bargained-for and intended opportunity,

1 after careful planning and marshaling resources, because the market
2 cooled during the time period that Plaintiff discovered Defendants'
3 intentional malfeasance.

## PARTIES, JURISDICTION, AND VENUE

4. Plaintiff is a Texas corporation that does substantial amounts of its business in Los Angeles, California, through its CEO and other representatives who reside and regularly conduct business here in this judicial district, including entering into the contracts referenced in this complaint and suffering the wrongdoing and harms described in this complaint.

5. Defendant SEMICONDUCTOR MANUFACTURING SOUTH CHINA CORPORATION ("SMSCC") is a People's Republic of China Shanghai corporation that is also a subsidiary of defendant SEMICONDUCTOR MANUFACTURING INTERNATIONAL COMANY ("SMIC"), a Cayman Islands corporation that is also a state-owned enterprise of the People's Republic of China. These companies were valued at approximately USC $36.1 billion in 2021 and had approximately 17,000 employees. SMCC and SMIC do business in Claifornia regularly, maintain offices here, have employees here, and introduce products in to the stream of commerce here, and also engaged in the actions herein described in this judicial district. Because defendants engage in significant business activity and maintain minimum contacts in this judicial district, general jurisdiction is proper here as well as submitting themselves to jurisdiction here as a result of their acts that are specific to events and wrongdoing herein described.

6. On information and belief, Defendants LIANG MONG SONG, an individual and ZHAO HAIJUN, an individual, are officers and/or directors and/or controlling shareholders of SMSCC and SMIC,

who were and are personally responsible for overseeing, supervising, directing, and/or ratifying the wrongdoing of the corporate defendants in this judicial district, as further described herein.

7. Defendant XING WANG, an individual, is a sales broker who acted on behalf of all the corporate defendants, including SMCC and SMIC, in this judicial district with their express approval, direction, and ratification, as further described herein.

8. Jurisdiction is proper pursuant to 28 U.S.C 1332(a)(2) because the amount in controversy exceeds $75,000 and the civil action is between citizens of a State and citizens or subjects of a foreign state.

9. Venue is proper for this Court pursuant to 28 U.S.C. § 1391, in that a substantial part of the events giving rise to Plaintiff's claims arose in this district as because the Defendant's actions complained of were directed toward Plaintiff in this judicial district, plaintiff does business in this judicial district through its CEO wo resides here, a substantial portion of the transactions and wrongs complained of herein occurred in this judicial district, and on information and belief, certain tangible and intangible property – both money that represents the Defendants' profits from their wrongdoing and the computer wafers – that is the subject of the action is located in this judicial district.

10. Plaintiff is unaware of the true names and capacities of the Defendants sued by the fictitious names, DOES 1 through 100, but allege that said fictitiously named Defendants are proximately responsible for the damages alleged herein. Plaintiff will seek leave of this court to amend this complaint when the true names and capacities of said fictitiously named defendants have been ascertained.

11. Plaintiff is informed and believe and thereon allege, that at all times herein mentioned, Defendants and each of them, were the

agents and/or employees of each of the remaining Defendants, and in doing the things herein alleged, were acting within the course and scope of said agency and/or employment, in that the actions of each of the Defendants as herein alleged were authorized, approved, and/or ratified by each of the other Defendants as principals and/or employers.

## BACKGROUND and GENERAL ALLEGATIONS

12. The nature of the transaction at issue relates to computer hardware intended for the manufacture of specialized computers referred to as cryptocurrency "miners."

## What is a cryptocurrency miner?

13. A cryptocurrency "miner" is a specialized computer designed for a single purpose, to "mine" (or discover) new cryptocurrency by solving complex mathematical puzzles. Each time a puzzle is solved, the owner of "miner" is rewarded with cryptocurrency.

14. Cryptocurrency is digital "money" with no connection to a government authority, with units of value called "tokens" (like poker chips or video arcade tokens). "Bitcoin," "Ethereum," and "Monero," are popular types of cryptocurrency, although there are many others. As explained below, these cryptocurrencies are traded on an exchange and can be sold for legal tender on an exchange, which operate in a manner similar to traditional currency and commodities exchanges.

15. Cryptocurrency is based upon a technology called blockchain. Blockchain is a software technology that connects, or links, groups of transactions ("blocks") together over time (in a "chain"). It can be imagined as a very, very, very, long ledger of transactions, like a checkbook, with complex cryptographic puzzles, or "keys" that ensure each transaction ("block" in the "chain") is secure and validated.

16. Therefore, cryptocurrency tokens in existence are tracked in a blockchain, or public ledger, that is stored on computers all over the world.

17. Blockchain transactions are public and transparent, but anonymous, (technology called "public key encryption"). They can be viewed, and validated anywhere in the world over the Internet. For this reason, blockchain is considered a highly secure and safe technology.

18. "Miners" create value because they assist in the validating of the blockchain by performing complex mathematical calculations that solve extremely complex cryptographic puzzles to validate cryptocurrency transactions. These mathematical calculations are energy intensive and require computer power from all over the internet.

19. When a "miner" finds a solution to a cryptographic puzzle, it will validate a "key" to help ensure the security of some blockchain transaction. That solution and expenditure of energy and computing power is rewarded by the system, in the form of an additional "token," adding to the blockchain.

20. Therefore, as compensation for their efforts, miners are awarded cryptocurrency tokens, or "coins" whenever they add a new block of transactions to the blockchain. The amount of new cryptocurrency coins released with each mined block is called the "block reward."

21. The more mathematical puzzles a "miner" solves, the more the owner of the "miner" is rewarded with tokens. Put succinctly, a miner exchanges energy through computing power for tokens that can be held, sold, or traded. All transactions are publicly available, tracked, and validated by blockchain technology.

22. Cryptocurrency tokens can be held in digital "wallets" which designate the tokens are owned by a single user. Tokens can be traded with others on special websites called "exchanges." Tokens can be exchanged for government-backed currency (called "fiat" in cryptocurrency circles). Cryptocurrency can be traded and can appreciate or depreciate based upon market forces.

23. One of the first and probably most well-known type of cryptocurrency is "Bitcoin," invented in 2009. Its initial value was zero, as mining activity began. By July, 2010, its price has increased to $0.09, and a year later was worth more than $29. At its peak, in November 2021, a single Bitcoin was worth more than $68,000. By December 2022, the price of a single bitcoin had dropped to below $20,000. As of the date this complaint is filed, one Bitcoin is worth about $28,000.

24. In short, the value of Bitcoin has fluctuated greatly, and while the price has generally tended to increase over time, mining activity now is far less lucrative that it was at the peak since each Bitcoin is now worth far less that it would have been had it been mined when Bitcoin was more popular.

25. Other cryptocurrencies, like Ethereum and Monero, introduced after Bitcoin, performed similarly over these more recent time periods, from 2021 through the present.

26. As further alleged herein, because of the defendants' wrongful conduct, Plaintiff was prejudiced because Plaintiff missed a one-time opportunity to maximize its profits at the peak of the cryptocurrency markets before a sell-off devalued bitcoin and destroyed the value proposition of investing in the design and manufacture of "miners" because the cryptocurrency to be mined is now worth far less than it was.

### What is a wafer and how does it relate to miners?

27. Semiconductors, typically made of silicon, are a crucial physical element in any computer because they conduct electricity between the metals and isolates, and therefore they are the key to the manufacture of processors and other microcircuits that are present in almost all computing devices.

28. Wafers are discs made of silicon that are used to build integrated circuits, which are key components of miners.

29. In 2021, semiconductors hit a world record in terms of sales. Electronics production also boomed, with hundreds of millions of complex semiconductors being devoured by gaming consoles, phones, and, as relevant here, cryptocurrency miners. Would-be cryptocurrency miners and speculators would buy up huge swaths of graphics processing units, or GPUs, based on the raw computing power of a GPU, to build miners and profit from the intense interest in cryptocurrency and resulting skyrocketing values of Bitcoin and other forms of cryptocurrency. The result was a global microchip shortage.[1]

30. The microchip shortage was worsened by the COVID-19 pandemic. Because many employees began to work at home, while the number of buyers increased hugely such that GPUs — a crucial component in home computers — and other chips simply disappeared from the market. In addition, droughts in Taiwan minimized the clean water necessary for semiconductor production and a major Texas power outage put many semiconductor fabrication plants far behind their

---

[1] *See* "Crypto-miners are probably to blame for the graphics-chip shortage" THE ECONOMIST, 19 June 2021, at https://www.economist.com/graphic-detail/2021/06/19/crypto-miners-are-probably-to-blame-for-the-graphics-chip-shortage (loaded 18 October 2023)

production goals. Tariffs put in place in January 2021 as part of a US-China trade war further restricted supply.

31. With supply at an all-time low and demand at a record high, semiconductor manufacturers naturally increased wafer prices as a result of the global chip shortage.

32. In this highly-constricted supply environment, wafer suppliers like the Defendants had tremendous bargaining power in dealing with purchasers like the Plaintiff who wished to manufacture miners in the hopes of capitalizing on rapidly-growing cryptocurrency mining.

33. Defendants here went too far, however, by insisting on payment in full, in advance, then surreptitiously selling the wafers that Plaintiff paid Defendants to produce to Plaintiff's competitors at a premium, thereby hobbling Plaintiff's ability to participate in the market during the most crucial time.

## FIRST CAUSE OF ACTION – FRAUD
## (AGAINST ALL DEFENDANTS)

34. Plaintiff realleges and incorporate herein by reference each and every allegation contained in the preceding paragraphs as set forth hereinabove.

35. On or about November 15, 2021, continuing through, until, and on December 7, 2021, Defendants, by and through Mr. Wang Xing, their broker and authorized representative, falsely represented to Plaintiff that Defendants were willing and able to provide 1,728 silicon wafers for Plaintiffs' intended purpose, to manufacture cryptocurrency miners, on a price and terms, provided, however, Plaintiff would be required to wire cash funds as and irrevocable prepayment in full.

36. That statement was false and was intended to induce detrimental reliance, because Defendants did not have the wafers and intended to use the Plaintiff's funds to manufacture or procure them.

37. Instead, on information and belief, at the time of the supposed promise, Defendants planned to re-sell the same wafers to a competitor of the Plaintiff for a higher amount, even though Plaintiff had been led to believe that it had obtained a rare opportunity to purchase sought-after and hard-to-procure silicon wafers in the midst of a global shortage.

38. Defendants, by and through Mr. Wang Xing, explicitly referred to approvals he had received from Mr. Liang Mong-Song and/or Zhao Haijun to consummate the transaction. On information and belief, these executives of the corporate Defendants, and certain DOE defendants not yet identified, knew of, approved, ratified, and/or directed the purported transaction and fraud thereupon.

39. Defendants, through Mr. Wang Xing, reassured Plaintiff that there was nothing to fear in making a full prepayment of millions of dollars in advance of delivery because defendants could and would produce and deliver the wafers timely and on the bargained-for terms.

40. These representations were false: on information and belief, Defendants had other plans because they were aware of the unique opportunity presented by the global chip shortage which empowered and emboldened them to sell the same wafers twice, while delivering nothing to Plaintiff who was tricked into paying in advance for wafers Defendants planned to sell to Plaintiff's competitors.

41. This fraud and misrepresentation was intentional, with a purpose of wrongfully depriving Plaintiff of money by creating a false

sale and tricking Plaintiff into wiring more than USD $19,080,000.00 to the Defendants, and each of them.

42. Thereafter, instead of shipping the pre-paid wafers to Defendant as promised, Plaintiff sold and shipped those same wafers to a third party competitor of Plaintiff at even higher prices.

43. By June 2022, the cryptocurrency market had crashed, yet Defendants had delivered no wafers to Plaintiff, still, despite their false promises. Because Defendants had represented delivery earlier, and reassured Plaintiffs that there would be no delays, and insisted on irrevocable pre-payment in full, Plaintiff was unable to obtain wafers in a timely manner, missed the opportunity to sell the miners at an opportune time, and suffered losses in excess of 40% of the value of the miners it managed to eventually sell.

44. Defendants knew that Plaintiff had represented to its third-party customers, in reliance on Defendants' promises, that Plaintiffs' miners would be delivered timely. Because the Defendants in fact had no intent to perform their promise, which Plaintiff did not know, Plaintiff was exposed to liability and suffered loss of goodwill and other damages amongst its customers, who were also damages by the inability to mine cryptocurrency at a crucial time, as promised.

45. In June 2022, Plaintiff demanded Defendants refund the prepaid USD $19.08 million. Defendants falsely represented they would issue a refund in 2023 because Defendants intended to mislead their investors by concealing the loss and liability they had suffered as a result of their misrepresentations to Plaintiff.

46. Plaintiff, in reliance on Defendants' promise of a full refund in 2023, did not immediately take further action to pursue their claims against Defendants.

47. Subsequently, Plaintiff discovered that Defendants had no intent to honor that promise either.

48. Defendants thereafter wired approximately USD $2 million, an amount they claimed was a partial refund, to a third-party company with no connection to the Plaintiff. On information and belief, that company, DOE 1, is an affiliate of the other Defendants and a co-conspirator in their fraud.

49. Those funds have never been recovered by Plaintiff. Defendants claimed that they had wired those funds to a third party to evade detection by the Foreign Currency Bureau of the People's Republic of China, who forbade a transfer of that amount of USD to the United States.

50. Defendants asked Plaintiff to alter and falsify its balance sheet to corroborate their lies to the Chinese government. Plaintiff refused.

51. Plaintiff has been damaged in an amount in excess of the jurisdictional limit.

52. Because the Defendants acted willfully, wantonly, and fraudulently, with malice and reckless and or conscious disregard for the Plaintiff's rights, and because each individual defendant acted with the express approval and/or ratification of the corporate defendants, Plaintiff is entitled to an award of punitive damages against all defendants.

## SECOND CAUSE OF ACTION - CONVERSION
### (AGAINST ALL DEFENDANTS)

53. Plaintiff realleges and incorporates herein by reference each and every allegation contained in the in the foregoing paragraphs as if set forth herein.

54. Defendants obtained a wire transfer from Plaintiff in the amount of $19,080,000.00 using false pretenses.

55. Plaintiff's' conduct was intentional.

56. Plaintiff has demanded that Defendants return the $19,080,000.00 taken wrongfully.

57. Defendants wired approximately $2 million to a third party affiliate of theirs, without Plaintiff's knowledge, authorization, approval, or ratification.

58. Plaintiff was damaged in an amount to be proven at trial, at least $30,000 and in no event less than the jurisdictional amount.

## THIRD CAUSE OF ACTION – BREACH OF CONTRACT
## (AGAINST ALL DEFENDANTS)

59. Plaintiff re-alleges and incorporates by reference each and every allegation set forth above, as if set forth herein.

60. On or about November 15, 2021, Plaintiff entered into oral, written, and implied agreement with Defendants (hereinafter "Agreement"). The written terms are not currently available to Plaintiff, but the terms thereof are described herein and were supplemented by the oral and implied terms described herein.

61. Under the terms of this Agreement, as demanded by Defendants, Plaintiff was required in writing, orally, and by implication to make "100% prepayment" of funds in the amount of $19,080,000 as required by Defendants, in exchange for delivery of 1,728 12-inch wafers, at a price of $11,000 each.

62. Plaintiff complied with the 100% prepayment terms by wiring money from Chase Bank in the United States on or about December 7, 2021, to Defendants' bank, the Bank of China Limited in Shanghai, China.

63. Plaintiff never received any wafers.

64. Instead, Defendant used Plaintiffs' funds to manufacture and deliver wafers to third parties, competitors of Plaintiff, at a higher price.

65. Plaintiff performed all conditions, covenants, and promises in accordance with the terms and conditions of the Agreement. To the extent any covenants and/or conditions have not been performed by plaintiff, they have been excused by breach or non-performance by defendants.

66. Defendants breached the agreement because nothing was delivered to Plaintiff despite the parties' Agreement.

67. As a direct and proximate result of Defendants' breaches, Plaintiff has sustained and will continue to sustain damages in an amount subject to proof at trial, together with prejudgment interest thereon at the maximum legal rate.

## FOURTH CAUSE OF ACTION – BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
## (AGAINST ALL DEFENDANTS)

68. Plaintiff re-alleges and incorporates by reference each and every allegation set forth above, as if set forth herein.

69. There are contracts between Plaintiff and Defendant as set forth herein.

70. Under California law, there is an implied covenant of good faith and fair dealing in every contract that neither party will do anything which will injure the right of the other to receive the benefits of the agreement.

71. Defendants failed and refused to take even the most basic steps to ensure Plaintiff is afforded any of full benefits of the bargain inherent in the Agreement by depriving Plaintiff of funds in a demand

for 100% prepayment, delivering no wafers in exchange for payment of millions of dollars, refusing to return the funds upon demand, suggesting that Plaintiff falsify accounting records to help Defendnats cover up their lies to the Chinese government, and wiring $2 million of Plaintiff's money to a third party, DOE 1, who is affiliated with the Defendants.

72. As a result, Plaintiff has been damaged in an amount to be proven at trial, but in no event less than the jurisdictional amount.

## FIFTH CAUSE OF ACTION – INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE
### (AGAINST ALL DEFENDANTS)

73. Plaintiff re-alleges and incorporates by reference each and every allegation set forth above, as if set forth herein.

74. Plaintiff maintained relationships with its existing clients and customers to provide cryptocurrency miners and promised to deliver manufactured miners to their customers based upon the falsehoods misrepresented to them by the Defendants.

75. Defendants were aware of those relationships and Plaintiffs' reliance on wafers as a key component in high demand and short supply necessary to the manufacture of cryptocurrency miners.

76. Defendants knowingly, recklessly, and intentionally disrupted those relationships by knowingly misrepresenting their ability to deliver wafers and/or their intentions by using Plaintiff's pre-paid funds to build or buy wafers and then selling wafers to Plaintiffs' competitors instead of to Plaintiff. As a result Plaintiffs' competitors were able to obtain significant market advantages over Plaintiff at a key moment when cryptocurrency was at its peak, a harm from which Plaintiff cannot recover.

77. Defendant intended to disrupt Plaintiff's business relationships, and they were indeed disrupted because Plaintiffs' inability to provide miners harmed the clients and customers, who in turn threatened to sue Plaintiff for failing to timely deliver cryptocurrency miners as promised.

78. As a direct and proximate result of Defendants' intentional interference, Plaintiff has sustained and will continue to sustain damages, including lost profits, prospective profits, and expenses associated with the interference, in an amount subject to proof at trial, together with prejudgment interest thereon at the highest legal rate.

79. Because the Defendants acted willfully, wantonly, and fraudulently, with malice and reckless and or conscious disregard for the Plaintiff's rights, and because each individual defendant acted with the express approval and/or ratification of the corporate defendants, Plaintiff is entitled to an award of punitive damages against all defendants.

## SIXTH CAUSE OF ACTION – NEGLIGENT INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE
### (AGAINST ALL DEFENDANTS)

80. Plaintiff re-alleges and incorporates by reference each and every allegation set forth above, as if set forth herein.

81. Plaintiff maintained relationships with its existing clients and customers to provide cryptocurrency miners and promised to deliver manufactured miners to their customers based upon the falsehoods misrepresented to them by the Defendants.

82. Defendants were aware of those relationships and Plaintiffs' reliance on wafers as a key component in high demand and short supply necessary to the manufacture of cryptocurrency miners.

83. Defendants negligently disrupted those relationships by misrepresenting their ability to deliver wafers and/or their intentions by using Plaintiff's pre-paid funds to build or buy wafers and then selling wafers to Plaintiffs' competitors instead of to Plaintiff. As a result Plaintiffs' competitors were able to obtain significant market advantages over Plaintiff at a key moment when cryptocurrency was at its peak, a harm from which Plaintiff cannot recover.

84. Plaintiff's business relationships were disrupted because Plaintiffs' inability to provide miners harmed the clients and customers, who in turn threatened to sue Plaintiff for failing to timely deliver cryptocurrency miners as promised.

85. As a direct and proximate result of Defendants' intentional interference, Plaintiff has sustained and will continue to sustain damages, including lost profits, prospective profits, and expenses associated with the interference, in an amount subject to proof at trial, together with prejudgment interest thereon at the highest legal rate.

**SEVENTH CAUSE OF ACTION – QUANTUM MERUIT – UNJUST ENRICHMENT;**

**(AGAINST ALL DEFENDANTS)**

86. Plaintiff re-alleges and incorporates by reference each and every allegation set forth above, as if set forth herein.

87. For the reasons set forth above, Defendants have received money and property which rightfully belongs to Plaintiff, and which in equity and good conscience, should be returned to the Plaintiff.

1  Accordingly, it would be unjust to permit Defendants to be enriched at
2  the expense of the Plaintiff.
3   88. Plaintiff hereby demand return of their money and property,
4  and are informed and believe that Defendants fail and refuse to return
5  said money and property to Plaintiff.
6   89. The amount Defendants were unjustly enriched exceeds the
7  jurisdictional minimum of this Court.

### EIGHTH CAUSE OF ACTION – UNFAIR COMPETITION IN VIOLATION OF BUS. & PROF. CODE 17200
### (AGAINST ALL DEFENDANTS)

90. Plaintiff re-alleges and incorporates by reference each and every allegation set forth above, as if set forth herein.

91. Section 17200, *et seq.*, of California's *Business and Professions Code,* also known as California's Unfair Competition Law ("UCL") prohibits any unlawful, unfair or fraudulent business act or practice. It also prohibits unfair, deceptive, untrue or misleading advertising.

92. Defendants engaged in deceptive and fraudulent acts, which they knew to be untrue.

93. Plaintiff is entitled to restitution and attorney's fees.

94. set forth herein.

### PRAYER FOR RELIEF

Wherefore, Plaintiff accordingly prays for the following relief:

1. For actual damages in a sum according to proof;
2. For general and consequential damages in a sum according to proof;

3. For exemplary and punitive damages in a sum according to proof;
4. For rescission and restitution;
5. For injunctive relief;
6. For pre-judgment and post-judgment interest as allowed by law;
7. For reasonable attorney's fees and costs of suit incurred herein, to the greatest extent allowed by law;
8. For such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial on all causes of action so triable.

DATED: October 23, 2023           TCW GLOBAL LEGAL GROUP

                                  By  */s/ Jade H. Chen, Esq.*
                                      Jade H. Chen, Esq.
                                      Attorneys for Plaintiff

DATED: October 23, 2023           DECLERCQ LAW, P.C.

                                  By  /s/ William B. DeClercq, Esq.
                                      William B. DeClercq, Esq.
                                      Attorneys for Plaintiff